# CHARLESTON

DAY v. LOUISVILLE COAL & COKE CO.

Submitted February 20, 1906.   Decided May 1, 1906.

1. WATER AND WATER COURSES—*Polluting Stream—Injury to Riparian Owners.*

  A company mining coal and making coke casts slag and other refuse materials into or near a stream, and they are carried by its waters and deposited on land of a riparian owner, doing damage to the land. The company is liable therefor to the land owner. (p. 28.)

2. TORTS—*Joint and Several Liability.*

  When the negligent acts of two or more persons, though acting independently of each other, concurrently result in injury to the property of another, they are liable either jointly or separately. (p. 31.)

3. LIMITATION OF ACTIONS—*Accrual of Cause of Action.*

  The cause of action to an owner of land damaged by deposit on it of refuse material put into a stream by a person in operations of mining coal and making coke, and thence carried by its waters and deposited on the land, first accrues when the material is deposited upon the land, and the statute of limitations does not run against such action until such material is deposited on the land. (p. 33.)

Error to Circuit Court, Mercer County.

Action by Joshua Day and wife against the Louisville Coal & Coke Company.   Judgment for plaintiffs, and defendant brings error.

*Affirmed.*

RUCKER, ANDERSON & HUGHES and R. C. & BERNARD MC-CLAUCHERTY, for plaintiff in error.

J. M. McGRATH and C. W. SMITH, for defendants in error.

BRANNON, JUDGE.

Joshua Day and his wife, S. E. Day, filed a declaration in trespass on the case in the circuit court of Mercer county against Louisville Coal & Coke Company, a corporation, alleging that S. E. Day owned a tract of land situate on Blue Stone river, about sixty acres consisting of river bottom, very fertile for agricultural purposes; that the river flowed

through the bottom land, and that the river, before damaged from the cause stated in the declaration, had been one remarkable for its beauty and the purity of its water, and contained a great number of valuable fish of many varieties; that the defendant became operator and owner of a coal mine and coke ovens located upon Flipping creek, which flowed into Blue Stone river at a point above the plaintiff's land; that the defendant wrongfully and negligently deposited large quantities of the slag, cinders, tailings and other waste and refuse from its mine and coke ovens in said creek, and so near it that its water, both during low water and ordinary freshets, caused said material to flow into the stream, and the waters of the creek and river carried large quantities of the slag, cinders, tailings and other waste and refuse down said stream and deposited them on the land of the plaintiff, S. E. Day, by means whereof forty acres of the bottom land was covered up with said slag, cinders, tailings and refuse and rendered worthless, and by means whereof twenty acres of corn, twenty acres of wheat, twenty acres of grass and twenty acres of oats, there growing, were covered up and destroyed, and that said materials were, by the waters of said stream, carried down and deposited in their beds and discolored and polluted the water of said stream, rendering it unfit for agricultural and domestic purposes. The defendant pleaded the statute of limitations of five years. A jury found a verdict for the plaintiff for three hundred dollars, on which judgment was rendered, and the defendant brings the case to this Court.

This case involves principles very important everywhere, but especially important in this State at present and in the future; but those principles are old and have been called into requisition through many, many years in actions for the pollution of streams, and casting into them hurtful things and depositing them upon lands of riparian owners on the stream below. The defendant contends that as it was using its property in carrying on a lawful business very useful to the public it is exempt from liability, as it was only exercising its rights. We are told by the able brief of the defendant's counsel that the affirmance of this judgment will be vastly hurtful and disastrous to the mining and coke interests of West Virginia, and have a tendency to

detract from the value of our land, and hinder the development of the great wealth of coal and iron in the bowels of our mountains, and will be subversive of great public policy, which demands the development of our wealth therein, and tends to the weal of the whole people of the state, and that a few individuals injured thereby must be without redress.    We cannot accede to this broad proposition.    The established maxim of centuries is *sic utere tuo ut alienum non laedas* (so use your own property that you do not injure another.)  That rule is almost equal to the Golden Rule in importance, and must never be lost sight of in the daily doings and transactions of organized society. A man has land upon a stream.  He is its sole lord.  No one has a right to injure that land.  It is protected by the Constitution.   If one up the stream in his works, be they ever so lawful, honorable and necessary for private weal, or public weal, do thereby injure the land of that owner further down by unlawful invasion of it, by casting upon it things damaging it, or by polluting the purity of the water, rendering it unfit for the owner's consumption, as it passes through his land, the man up the stream must answer in damages. One man without fault is injured by another.  That is enough for liability. This is the general principle of the common law.  One man cannot thus injure another.  Especially is this so in this state where the Constitution says that private property shall not be damaged for public use without compensation.  How then can it be damaged for private interests or to promote a supposed policy?  The authorities are ample on this subject to sustain this position.  "The doctrine stated in the preceding section, that the importance of the business of the upper proprietor was not enough to justify him in polluting the water of the stream to the injury of the lower proprietor, has been tested and fully sustained in cases involving the rights of persons engaged in mining operations to pollute the streams.  In the operation of any mine there are large quantities of refuse which must be removed and stored, and an easy method of disposing of them was found to be to permit them to be washed into the streams, to be carried away by the action of the water and this was especially true with respect to hydraulic mining, where the earth was actually removed from its place by the

force of the water. When the system of hydraulic mining became perfected, it was found that the *debris* from the mines was being carried down the streams with disatrous effect. Large stretches of country covered with buildings and hamlets were buried, in some instances above the tops of the houses. Even cities had to fight to maintain their existence, and the navigability of some of the largest streams was being impaired. In this condition of affairs resort was had to the courts for relief. After a severe fight the lower proprietors finally obtained a decision from a United States court in which, with an exceedingly valuable historical opinion, it was held that persons mining with the hydraulic process may be enjoined from discharging the *debris* into a river, whence it flows to the valley below, burying valuable farms and creating a public and private nuisance. And this rule prevents the casting of *debris* from the mine into the stream, or abandoning it so that it will find its way there in such manner as to injure the lower proprietor. So, it prevents the miner from casting his tailings into the stream in such a way as to injure lower owners. The same rule applies to culm from a coal mine. * * * * A mill for the reduction of ores cannot be permitted to throw its refuse into the stream to the injury of lower property.'' Farnham on Waters, section 518. In the well considered case of *Columbus & H. Coal & Iron Co.* v. *Tucker*, 48 O. St. 41, the rule is thus laid down: ''In an action brought by a riparian owner to recover of a mining company damages to his lands, and for polluting the water of a stream, which runs through them, by depositing on its own lands, coal slack, dirt and refuse, in places from which the same had been washed down and onto the lands of the plaintiffs, the evidence showing substantial injury to have been produced thereby; that the deposits were made intentionally; and that such results might, at the time the deposits were made, have been anticipated by a person of ordinary intelligence and prudence,—a right to recover is established, and it is not a defence to show that the operation of the mines, and the deposit and disposal of the slack, etc., was conducted in the mode in general practice in the operation of similar coal mines in the surrounding mining districts, and that such deposits were made without malice, and upon the only feas-

ible place or places the company could deposit the same, and carry on the business of coal mining.'' See 30 Am. & Eng. Ency L. (2d Ed.), 380; *Trevett* v. *Prison*, 98 Va. 332; *Tennessee* v. *Hamilton*, 46 Am. St., 48. *Elder* v. *Lykens*, 37 Am. St. R. 742; *Frick* v. *Quinn*, 41 Atl. 737. ''No person, natural or artificial, has the right to cover his neighbor's land with *debris* from his mine or mill, nor to permit any of his refuse matter to flow or be placed upon the land of another.'' Snyder on Mines, section 1073. Of the subject of dumping tailings from mines and *debris* from coal mines into a running stream that work in section 1076, says, it has been a fruitful source of litigation, and ''it may be laid down as a general rule that whoever causes an injury to another's land by any of the means above enumerated must respond in damages.'' Thus the liability in this case is clear.

But in defence the defendant showed that various other coal and coke works, separate and distinct from that of the defendant's, carried on by other operators, threw their refuse into the same creek and river, and that the injury to the plaintiff's land came as well from the acts of others as from the defendant, and that the plaintiff cannot maintain his action against the defendant and make it responsible for damage which came from the act of others. It contends that it is not liable further than the damage caused by its act. There are some authorities to support this proposition, but the authorities against it very decidedly preponderate, and they harmonize with right, reason and the established law of centuries. This damage comes from tort, not contract, and it is a rule of law as old as the hills that in a tort all participating or contributing in the wrong, working the injury, are liable and any single one is liable; one can be sued or more can be sued. It is contended for the defendant that the acts of these different operators were independent of each other. The defendant's act separate and distinct from the others, and that it is only where tort-feasors act jointly that one or all may be sued. This proposition cannot be sustained as will appear from the following authorities. In 21 Am. & Eng. Ency. L. (2d Ed.), 796, it is laid down that ''Where the negligence of two or more persons acting independently, concurrently re-

sults in injury to a third, the latter may maintain his action for the entire loss against any one or all of the negligent parties, it not being essential, it has been held, to the maintenance of a joint action against several for negligence that they should be engaged in common enterprise or sustain any relation whatever between themselves.'' The same doctrine is laid down in 15 Ency. Pl. & Prac., 557. Wharton on Neg. section 144, says: ''The fact that another person contributed either before the defendant's interposition, or concurrently with such interposition in producing the damage, is no defence.'' 1 Sherman and Redfield on Neg,. section 122 (4 Ed.) says: ''Persons, who co-operate in an act, directly causing injury, are jointly liable for its consequence, if they act in concert, or unite in causing a single injury, even though acting independently of each other.'' Cooley on Torts, p. 79, says: ''A fourth proposition may be stated thus; that, if the damage has resulted directly from concurrent wrongful· acts or neglects of two persons each of these acts may be counted on as the wrongful cause and the parties held responsible, either jointly or severally, for the injury.'' In 16 Am. Rep., 251 we find this, ''Where one act of negligence unites with another and like act, or with any other cause, in inflicting injury upon the person or property of another, whose negligence has not also contributed to his injury, and there exists no means of determining the extent to which the injury resulted from either negligent act, it is obvious that each person guilty of negligence must be either held entirely exonerated, or as answerable for the whole damages inflicted in part by his negligence. In all the instances in which his negligence can be regarded as the proximate cause, or one of the proximate causes, of an injury, he is answerable for the whole thereof, either separately or jointly and severally, with any other person whose negligence or other wrongful act may also have been one of the proximate causes of such injury.'' The same principle is laid down in *Grand Trunk Co.* v. *Cummings,* 106 U.S. 700. ''Where separate and independent acts of negligence of two parties are the direct causes of a single injury to a third person and it is impossible to determine in what proportion each contributed to the injury, either is responsible for the whole injury; and this, although his act alone

might not have caused the entire injury, and although without fault on his own part, the same damage would have resulted from the act of another." *Slater* v. *Mersereau*, 64 N. Y. 138; *Boyd* v. *Watts*, 27 O. St. 259. But why cite other authorities when we have the case of *Johnson* v. *Chapman*, 43 W. Va. 639, holding that where two contiguous buildings fall upon a third because of co-existent and concurring negligence of the separate owners to keep their separate walls in repair, they are liable in joint or separate suits. Judge Dent aptly said, "It is not a question of comparative negligence, but of contributory; for if the negligence of one of two defendants contributed toward the injury, he cannot escape liability by showing greater negligence on the part of his co-defendant." If it were required in this case that plaintiff show just how much the act of defendant contributed to his injury, what fraction of his total damage, he could not do so—it would deny him relief.

As to the plea of the statute of limitations for five years. The time did not begin to run against this action until the actual happening of the damage. It is contended earnestly that the time began to run from the deposit of the refuse in the stream. That is plainly an untenable position. What right had the plaintiff to sue until she was actually damaged by the deposit on her land? None. It is needless to discuss this question. I refer to *Henry* v. *Ohio River R. Co.*, 40 W. Va. 234; *Eells* v. *C. & O. R. Co.*, 49 *Id.* 65; *Austin* v. *Anderson*, 23 Am. St. R. 350.

Therefore, we must affirm the judgment.

*Affirmed.*